UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LANDON DAVID PARKER, by next friends | § | |
| John Chauvet Parker and Cristin Parker, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.   1:11-cv-12 |
| | § | |
| CHRIS TRAYLOR, in his official capacity | § | |
| as COMMISSIONER, TEXAS | § | |
| DEPARTMENT OF AGING AND | § | |
| DISABILITY SERVICES, and TOM SUEHS, | § | |
| in his official capacity as EXECUTIVE | § | |
| COMMISSIONER, TEXAS HEALTH AND | § | |
| HUMAN SERVICES COMMISSION, | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT**

Landon David Parker ("Landon"), by his next friends and guardians John Chauvet Parker and

Cristin Parker, complaining of and against Chris Traylor, in his official capacity as Commissioner of

the Texas Department of Aging and Disability Services ("DADS"), and Tom Suehs, in his official

capacity as Executive Commissioner of the Texas Health and Human Services Commission

("HHSC") (collectively, "Defendants"), alleges the following:

## I.  INTRODUCTION

1.      John Chauvet Parker and Cristin Parker bring this action on behalf of their twenty-one

year old medically fragile son, Landon, whom Defendants have indicated that they will deprive, on

January 12, 2011, of the private-duty nursing services he needs to survive.

*Plaintiff's Original Complaint*

2.      Landon has medical diagnoses of, among other things, encephalopathy, cerebral palsy, seizure disorder, Crohn's disease, reactive airway disease, chronic respiratory failure, dysphagia, scoliosis, spasticity, left hip and right shoulder dislocation, decubitus ulcers, quadriplegia, and mental retardation.  Landon is nonverbal, legally blind, oxygen-dependent, and nonambulatory. Landon has undergone gastrostomy and fundoplication procedures, implantation of an intrathecal pump, and spinal fusion with rod placement.

3.      As a result of these medical conditions, Landon requires continuous skilled care.  A skilled caretaker, among other things, must

· suction Landon's mouth and airway frequently;

· closely monitor his respiratory status and oxygen saturation level;

· administer respiratory treatments several times a day;

· closely monitor his seizure activity;

· continuously monitor Landon's core body temperature;

· frequently reposition Landon to prevent skin breakdown; and

· administer his medications through a gastrostomy tube.

Without constant attention to his many complex medical needs, Landon is at extreme risk of death.

4.      Landon David Parker is twenty-one years old.  He currently lives with his parents, John Chauvet Parker and Cristin Parker.  Landon has been able to receive the nursing services he requires to survive in the family home because he is eligible for Medicaid-funded services.  For many years, the Texas Health Steps Comprehensive Care Program ("CCP") and the Medically Dependent Children Program ("MDCP") have provided him with 149 hours of private-duty nursing services per week.  However, once individuals turn twenty-one, they are no longer eligible for CCP

and MDCP.  Consequently, prior to Landon's twenty-first birthday, he sought services under a Medicaid waiver program for adults, the STAR+PLUS waiver ("SPW") program, as well as additional funding under a state-funded program, Rider 36, so that his medical needs could continue to be met in his parents' home after he turned twenty-one.  Rider 36 is a state-funded program under which individuals with significant disabilities whose service plans would exceed the usual cost ceilings for long-term community care programs, such as the SPW program for which Landon would be appropriate, can receive medically necessary services, including nursing, in community settings.

5.      In a letter from HHSC staff member Joe Vesowate dated May 17, 2010, Landon was denied Rider 36 funds because of Defendants' conclusion that his "health and safety can be protected . . . in a state supported living center or nursing facility."  This conclusion directly contradicts the opinion of Landon's pediatrician of 16 years that institutionalization would be medically unacceptable for Landon and would create an imminent risk of his death.

6.      Defendants have agreed to extend Landon's services until January 12, 2011, at which time Landon will be terminated from the Texas Medicaid programs that have provided him with the private-duty nursing services he requires to stay alive while living in his parents' home.

7.      His parents' home is the only place Landon has ever lived and, according to his treating medical professionals, it is the only place where his complex care needs can be met.  Despite this, Texas Medicaid plans to entirely eliminate the life-sustaining private-duty nursing care he has received in his parents' home simply because Landon turned twenty-one years old.

8.      No hearing of any kind has been held by Defendants with respect to their conclusion that Landon's health and safety can be protected in a state facility.  HHSC has not responded to a May 19, 2010 letter written by the undersigned requesting a fair hearing on the denial of Rider 36

*Plaintiff's Original Complaint*

funding, despite the fact that Rider 36 determinations in this case and others are decisive with respect to whether Medicaid funds will be made available, and Medicaid determinations are statutorily subject to fair hearing requirements, 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200, 431.220; 1 TEX. ADMIN. CODE § 357.3; 40 TEX. ADMIN. CODE § 9.169(a).

9.      Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134, prohibits public entities from discriminating against qualified persons with disabilities in providing services.  Similarly, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a), prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization: "[T]he proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  Consistent with this federal law, Texas state law in the form of the Persons with Mental Retardation Act ("PMRA"), TEX. HEALTH & SAFETY CODE §§ 591.005, 592.013, 592.032, expressly contemplates an individual's "right to live in the least restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to the client's individual needs."

10.      In this case, Defendants have provided Landon with home-based services since his early childhood through various Medicaid-funded programs and have now, in disregard of all of the

*Plaintiff's Original Complaint*

foregoing facts and legal standards, resolved to terminate his home-based services in their entirety, which effectively condemns Landon to die quickly.

11.     Because the denial of funding for services in this case does not satisfy the foregoing legal standards, because Defendants have not provided a fair hearing to Landon or reasonably considered or addressed the facts related to Landon's health and safety, and because the denial of funding for services effectively condemns Landon to a quick death, Landon's parents, John Chauvet Parker and Cristin Parker, bring this action on Landon's behalf, seeking to require Defendants to provide Landon an administrative fair hearing to appeal the denial of Rider 36 funding, enjoin the denial of funding for nursing services pending the outcome of that fair hearing, continue the funding for Landon's home care that is essential to his survival, and obtain declaratory relief that Defendants' denial of funding for nursing services for Landon Parker in his home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and implementing regulations, 28 C.F.R. §§ 35.130(d), 41.51(d), as well as TEX. HEALTH & SAFETY CODE §§ 592.013, 592.032.

## II. PARTIES

12.     John Chauvet Parker and Cristin Parker are the parents and legal guardians for Plaintiff Landon David Parker, their disabled adult child.  Plaintiff and his parents reside in Williamson County, Texas.

13.     Defendant Chris Traylor is the Commissioner of the Texas Department of Aging and Disability Services.  DADS is a state agency with principal offices at 701 West 51st Street, Austin, Texas 78714.  Commissioner Traylor may be served at that location.

*Plaintiff's Original Complaint*

14.     Defendant Thomas Suehs is the Executive Commissioner of the Texas Health and Human Services Commission.  HHSC is a state agency with principal offices at 4900 North Lamar Blvd., Austin, Texas 78751.  Executive Commissioner Suehs may be served at that location.

### III.  JURISDICTION

15.     Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1343, 1367.  Declaratory relief is authorized under 28 U.S.C. §§ 2201, 2202.

16.     Plaintiff's discrimination claims are brought pursuant to, *inter alia*, 42 U.S.C. § 12133, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983.  Plaintiff's due process claims are brought pursuant to, *inter alia*, the United States Constitution and 42 U.S.C. § 1983.

### IV.  VENUE

17.     Pursuant to 28 U.S.C. § 1391(b)(1)–(2), venue is proper in the United States District Court for the Western District of Texas because Defendants reside in the Western District and a substantial part of the events giving rise to this cause of action occurred in the Western District.

### V.  FACTS

The Texas Medicaid Program

18.     The Medicaid program is a joint federal- and state-funded program enacted to provide necessary medical assistance to needy aged or disabled persons and families with dependent children whose income and resources are insufficient to meet the cost of care.  42 U.S.C. § 1396-1.  States choosing to participate in the Medicaid program must operate the program in conformity with federal statutory and regulatory requirements.  42 U.S.C. § 1396a.

19.     Each State participating in the Medicaid program must submit a Medicaid plan to the Secretary of Health and Human Services for approval.  42 U.S.C. § 1396-1.

*Plaintiff's Original Complaint*

20.     Each State must also designate a single state agency to administer and/or supervise the administration of the State's Medicaid plan.  42 U.S.C. § 1396a(a)(5).

21.     HHSC is the Medicaid single state agency in Texas.

22.     Through a federally approved waiver, States have the option of covering home and community-based services for persons who would otherwise require institutional care that would be paid for by Medicaid.  42 U.S.C. § 1396n(c)(1).  Under the waiver authority, the Secretary of Health and Human Services may grant waivers of specified requirements like service limitations that are otherwise applicable to the State's Medicaid plan.  42 U.S.C. § 1396n(c)(3).  Medicaid home and community-based waiver programs enable states to provide the level of services that people would typically receive in institutional settings in their own homes or other community settings.  42 U.S.C. § 1396n(c)(1).  Waiver programs must be cost-neutral in that the average cost of providing care for program participants in the home or community-based settings must not exceed the estimated average cost of providing the care that they would require in institutional settings. 42 U.S.C. § 1396n(c)(2)(D); 42 C.F.R. § 441.302(e).

23.     Texas has implemented federally approved home and community-based care waiver programs in its Medicaid program.  Included among these programs is the Community Based Alternatives ("CBA") program, which is a waiver program for persons requiring either a nursing facility level of care or an Intermediate Care Facility for the Mentally Retarded ("ICF/MR") level of care.

24.     In most Texas counties, HHSC has delegated to DADS the authority to operate the CBA program.  However, in certain counties in and around large metropolitan areas, such as

Williamson County, where Landon and his parents live, HHSC operates a managed care variant of the CBA program called the STAR+PLUS waiver ("SPW") program.

25.     This waiver provides medical assistance to aged and disabled Medicaid recipients needing a nursing facility or ICF/MR level of care in their homes and other community-based placements.  Overall program costs must be less than what services would cost in institutions.  The SPW program's essential purpose is to provide medical assistance to persons needing a nursing facility or ICF/MR level of care in the community as an alternative to institutional care.  Services include adaptive aids, medical supplies, adult foster care, assisted living/residential care, nursing services, minor home modifications, occupational therapy, personal assistance services, physical therapy, respite care, and unlimited prescription drug coverage.

Landon Parker and His Medical Condition

26.     Landon Parker is a twenty-one year old individual with significant disabilities, including mental retardation.  He is eligible for Medicaid.

27.     Landon has the following medical diagnoses: encephalopathy, cerebral palsy, seizure disorder, Crohn's disease, reactive airway disease, chronic respiratory failure, dysphagia, scoliosis, spasticity, left hip and right shoulder dislocation, decubitus ulcers, and quadriplegia.  Landon is also non-verbal, making it impossible for him to communicate his medical needs to his parents or his treating medical professionals.

28.     As a result of his numerous medical conditions, Landon requires continuous one-on-one skilled care.  Landon is unable to regulate his oral secretions, so his airway must be suctioned frequently to prevent aspiration.  Because Landon is nonverbal and thus unable to communicate his need for suctioning, he must be closely monitored at all times, as he is in danger of choking on his own secretions if left unattended for any length of time.  He must be constantly monitored for the seizure activity that he experiences multiple times per day.  Skilled caregivers must maintain Landon's airway, maintain his oxygen saturation, and protect him from injury during the seizures. Landon is unable to adequately breathe on his own and is oxygen-dependent twenty-four hours per day.  He regularly experiences significant respiratory distress.  His respiratory status must be carefully monitored, by measuring his oxygen saturation level and by auscultation of the lungs, in order to assess the need to administer respiratory treatments through an intrapulmonary percussive ventilation system, chest vest, hand-held electric percussor, or nebulizer.  Landon must be monitored while he is fed through his gastrostomy tube because of a variety of complications that commonly occur during feedings that affect his respiratory and cardiac status.  Skilled caretakers must administer Landon's medications.  Because Landon takes so many medications and because so many of them are prescribed on an as-needed basis, he must be monitored for side effects of the medications.  Landon's gastrostomy tube, though which he receives his nutrition and medication, must be cleaned regularly.  A skilled caretaker must perform wound care for Landon's decubitus ulcers and must reposition him frequently to prevent further skin breakdown.  He must receive skilled interventions to maintain his passive range of motion in his upper and lower extremities. Because Landon cannot verbalize complaints of pain, he must be monitored by a skilled caregiver that is familiar with him for signs and symptoms of pain, so that the caregiver can intervene by

repositioning Landon or administering medication.  Because of Landon's Crohn's disease, a skilled caregiver must monitor his bowel function.

29.     Landon's nursing care cannot be delegated to unlicensed personnel.  Oral suctioning, monitoring seizure activity, monitoring respiratory status, administering respiratory treatments, administering medications through Landon's gastrostomy tube, monitoring side effects of medication, wound care, intervening to maintain Landon's passive range of motion, monitoring for signs of pain, and monitoring bowel function are medical interventions that must be performed by a nurse or other appropriately qualified licensed medical professional.

<u>Texas Medicaid Services Provided to Landon Parker</u>

30.     Texas implements the requirements of the Medicaid Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") services program through the Texas Health Steps Comprehensive Care Program ("CCP").  CCP provides all medically necessary and appropriate Medicaid services to Medicaid-eligible children under twenty-one years old.  Under CCP, children are eligible to receive a variety of services, including private-duty nursing and durable medical equipment.  CCP services, however, end when recipients reach their twenty-first birthday.  Texas also has a waiver program for children under the age of twenty-one who need a hospital level of care, called the Medically Dependent Children's Program ("MDCP").

31.     Prior to the approach of Landon's twenty-first birthday on March 14, 2010, and until his CCP and MDCP nursing services terminate on January 12, 2011, Texas Medicaid determined that Landon's medical needs could be met in his parents' home.  To meet his needs, Defendants authorized 149 hours of private-duty nursing services each week.  These services were provided by a licensed registered nurse or licensed vocational nurse in Landon's parents' home.

*Plaintiff's Original Complaint*

32.    Since his early childhood, his treatment team has determined that providing private-duty nursing services to Landon in his parents' home was the most appropriate way to meet his complex medical needs.

33.    While he was under the age of twenty-one and until January 12, 2011, Landon is receiving services from CCP and MDCP.  Under CCP, Landon receives 126 hours per week of private-duty nursing care.  Under MDCP, he receives an additional twenty-three hours per week of skilled nursing services.  While receiving CCP services, Landon qualifies for and receives all of his prescription medications each month.

34.    Medicaid recipients like Landon lose their eligibility for CCP and MDCP services, including private-duty nursing services through these programs, when they turn twenty-one years old.  For Landon, the only available option to remain at home and to continue receiving care in a community setting is to attempt to transition to one of the home and community-based waiver programs, such as the SPW program.

35.    Historically, the SPW program had funded community-based services at a cost of up to 100% of the daily rate for a nursing facility.  However, beginning with Texas's 80th legislative session, the State of Texas modified SPW and other waiver programs, with approval from the Center for Medicare and Medicaid Services.  These modifications increased the cost ceiling for the SPW program to 200% of the daily rate for a nursing facility and created a program that allows SPW recipients to receive additional funding, above the 200% cost ceiling,  for community-based services.

*Plaintiff's Original Complaint*

35.     Under the General Appropriations Act, 81st Legislature, Regular Session, 2009, Article II, DADS Rider 36 ("Rider 36"), SPW waiver recipients who live at home are potentially eligible to receive up to 200% of the annual cost of services in a nursing facility.  As long as the SPW service request is at or below 200%, the recipient's Individual Service Plan (ISP) can be approved using the normal administrative processes.  Under these processes, if funding for the requested services on the ISP is denied, SPW applicants or recipients are entitled to request an administrative hearing to challenge the denial.

36.     For individuals such as Landon, whose home care needs exceed the 200% cost limit, Rider 36, TEX. HUM. RES. CODE § 32.058(e), and 40 TEX. ADMIN. CODE § 40.1 specify that state general revenue funds may be used to pay for services above the individual cost limit of a waiver program.  These individuals may request funding from state general revenue funds to cover medically necessary services that are projected to have costs in excess of the 200% cost limit.  To qualify for General Revenue funded waiver services, DADS must determine that (1) the individual's health and safety cannot be protected by the services provided within the individual cost limit established for the SPW program, and (2) there is no other available living arrangement in which the individual's health and safety can be protected.  *See* General Appropriations Act, 81st Legislature, Regular Session, 2009, Article II, DADS Rider 36; TEX. HUM. RES. CODE § 32.058(e); 40 TEX. ADMIN. CODE § 40.1.  Unlike services provided at or under the 200% cost limit, where there are federal funds in addition to State funds that pay for SPW waiver services, under Rider 36, General Revenue funds do not qualify for matching federal funds to pay for SPW waiver services over 200%.  In addition, unlike individuals with projected service costs at or below 200%, who are entitled to a hearing to dispute service denials, individuals denied Rider 36 funds are denied due process rights and cannot challenge funding denials in an administrative forum.

*Plaintiff's Original Complaint*

37.     Prior to Landon's twenty-first birthday, Rider 36 funds were requested on his behalf so that he could continue to live in his parents' home and receive the medically necessary nursing services he requires to survive.

38.     As of Landon's twenty-first birthday on March 14, 2010, Defendants had not made a decision on Landon's Rider 36 funding request and agreed to extend the 149 hours per week of nursing services he had received while under twenty-one until May 31, 2010.

39.     Finally, Defendants denied Landon's Rider 36 request in a letter dated May 17, 2010. Defendants have not responded to Plaintiff's request for an administrative hearing to challenge the denial of Rider 36 funding.  Defendants have agreed to extend Landon's current level of services through January 12, 2011.

40.     Without the nursing and other services that Landon currently receives, his parents are unable to continue to care for Landon in their home as they are unable to personally provide Landon with the round-the-clock skilled care he requires.  Because Landon was denied Rider 36 funds, he will be forced to leave his parents' home and enter an institutional placement that is totally inadequate to meet his needs.

41.     On January 12, 2011, when Landon is terminated from the CCP and MDCP programs, his nursing provider will entirely discontinue providing nursing services to him, and the current plan is to place him in a nursing facility.  Absent intervention, Landon will be placed in an institutional setting that is wholly inappropriate to meet his need for constant supervision and round-the-clock care, and his life will be placed in imminent danger.

The Effects of Removing Landon Parker from His Parents' Home

42.     If Landon is moved from his parents' home and into a nursing facility or other institutional setting such as a state supported living center, Landon would require the individualized

13

services of a registered nurse or licensed vocational nurse for twenty-four hours each day.  A state supported living center, or other institution, will have to provide to Landon twenty-four hours per day of private-duty nursing, which is "nursing services for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility."  42 C.F.R. § 440.80.

43.     State supported living centers in Texas vary in size.  They can house anywhere from around 100 to well over 600 individuals.  In these institutions, residents do not have individual rooms, but instead must share a room with four or five other residents.  The resident rooms are located on large wards, housing approximately 100 individuals.

44.     Texas state supported living centers, which are operated by Defendant DADS, have come under considerable scrutiny in recent years following a Department of Justice investigation that found rampant abuse and neglect of residents of the Lubbock State supported living center facility. The Department of Justice has since investigated other state supported living center facilities and continues its oversight of the Texas state supported living center system.  These investigations call into serious question the appropriateness of the institutional placements for some of our most vulnerable citizens, people with mental retardation.

45.     As part of a settlement agreement between the state of Texas and the U.S. Department of Justice, three teams of professionals in the field of intellectual and developmental disabilities have been assigned responsibility for conducting a baseline review and subsequent on-site compliance monitoring visits at each of the twelve state supported living centers in Texas as well as at the ICF/MR component of the Rio Grande State Center.  Each of the three teams of professionals is under the direction of a lead monitor who was jointly selected by the state of Texas and the U.S. Department of Justice.

14

46.     So far, the monitors have issued baseline reports for every facility and compliance reports for four of the facilities.  Every single report identifies deficiencies relating to the assessment of risk for aspiration or interventions related to aspiration.  Because Landon is at extreme risk for aspiration, a state supported living center is a wholly inappropriate placement for him.

47.     Landon's medical needs cannot be met in an institutional setting at a cost less than the cost of caring for him in his parents' home.

48.     Landon's health and safety cannot be protected by the services that would be available to him with an allocation at or below 200% of the nursing facility rate, and there is no available living arrangement, other than his parents' home, in which his health and safety can be protected.

Caring for Landon Parker in His Parents' Home

49.     In order for Landon to be able to remain in his parents' home, he must maintain the level of services that the State of Texas has been providing him—the services of a registered nurse or licensed vocational nurse at least 149 hours each week.  While Landon was under twenty-one years of age, Texas Medicaid officials determined that his medical needs could be met in his parents' home, and Medicaid covered all of the costs of Landon's in-home medical care.  Texas Medicaid repeatedly approved Landon's home care plan as a safe and necessary means for meeting his complex needs.

50.     Landon's parents love him dearly and want Landon to remain in their home.  Landon has always been lovingly cared for in the family home.  Landon has outlived all conceivable expectations for his life span, and this is directly attributable to the excellent care and loving environment provided by his parents.

51.     Landon's need for an intensive level of individualized nursing services and the appropriateness of meeting Landon's nursing and other medical needs at home are not changed by virtue of his turning twenty-one years old.

Defendants' Failure to Serve Landon Parker in the Least Confining, Most Integrated Setting

52.     If Landon were placed in a state supported living center for the mentally retarded or a nursing facility, the Texas Medicaid program would pay all the costs of his care.

53.     With no statutory or regulatory modifications and only minimal modifications to practices, DADS and HHSC could continue to fund the cost of Landon's care in his parents' home in an amount less than the cost of caring for Landon in an institution.

54.     Landon will still require round-the-clock one on one nursing services if placed in an institution.  However, Defendants have not made assurances that Landon will continue to receive this level of care in the nursing home that they have identified as a potential placement for him.

55.     Failure to provide Landon with constant skilled supervision is tantamount to a death sentence for this young man.  Defendants' proposed termination of Landon's in-home nursing services places Landon's health and life in serious jeopardy.

56.     As an individual with a disability, Plaintiff's only income is Supplemental Security Income ("SSI") benefits in the amount of $674 per month.  Thus, he is unable to post bond or other security for purposes of seeking the relief requested herein.

57.     The undersigned notified attorneys within HHSC and DADS repeatedly, including most recently on January 4, 2011, that an Application for Temporary Restraining Order and Preliminary Injunction would be filed if Landon's nursing services were terminated.

## VI.  CAUSES OF ACTION

**Violations of Due Process, federal Medicaid law, 42 U.S.C. § 1983,
and the Texas Administrative Code**

58.     Plaintiff hereby incorporates by reference paragraphs 1 through 57 of this Complaint.

59.     Landon's eligibility for and receipt of Medicaid services creates a property right subject to due process protection under the Fourteenth Amendment to the Constitution of the United States and Article I, § 19 of the Texas Constitution.

60.     Texas regulations specifically provide for a fair hearing as required by 42 C.F.R. Part 431, subpart E, to Medicaid recipients who are denied waiver program services.

61.     Defendants have not provided Landon the necessary procedural protections.

62.     By denying Plaintiff the opportunity for a fair hearing to challenge the denial of the funding that would have allowed SPW services to be provided, Defendants have violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, Article I, § 19 of the Texas Constitution, federal Medicaid law and regulations, and state regulations.

63.     Landon is entitled to a fair hearing with respect to Defendants' denial of state general revenue funds that are inextricably intertwined with Medicaid-funded services. *Knowles v. Horn*, No. 3:08-CV-1492-K, 2010 WL 517591, at *6 (N.D. Tex. Feb. 10, 2010); *see also* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200, 431.220; 1 TEX. ADMIN. CODE § 357.3.

64.     Defendants are liable for the violations of federal constitutional and statutory law pursuant to 42 U.S.C. § 1983.

65.     Defendants' acts will cause Landon irreparable injury for which there is no adequate remedy at law.

## Violations of the ADA and Section 504

66.     Plaintiff hereby incorporates by reference paragraphs 1 through 65 of this Complaint.

67.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits public entities from discriminating against qualified persons with disabilities in the delivery of services.  Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a), prohibits recipients of federal funds from discriminating against qualified persons with disabilities. Policies and practices that have the effect of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under these Acts.

68.     DADS and HHSC are public entities within the meaning of that term under Title II of the ADA.

69.     DADS and HHSC are recipients of federal funds within the meaning of that term under Section 504.

70.     Landon is a qualified individual with a disability under the ADA and Section 504.

71.     Under 28 C.F.R. § 35.130(d), implementing Title II of the ADA, public entities must administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  This same requirement applies to recipients of federal funds under the regulations implementing the Rehabilitation Act.  28 C.F.R. § 41.51(d).

72.     Landon's home constitutes the most integrated, least restrictive, and least confining setting for him.

73.     Defendants' acts constitute unlawful discrimination under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and violate the integration mandate of the regulations implementing these statutory prohibitions against discrimination, 28 C.F.R. §§ 35.130(d), 41.51(d).

74.     Defendants' termination of Medicaid funding for the life-sustaining nursing services Landon requires to avoid institutionalization violates the Americans with Disabilities Act and in particular 42 U.S.C. §§ 12131–12134 and the implementing regulations at 28 C.F.R. § 35.130(d), which require Defendants to make services available in the community rather than in institutions.

75.     Defendants' termination of Medicaid funding for the life-sustaining nursing services Landon requires to avoid institutionalization violates the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and the implementing regulations at 28 C.F.R. § 41.51(d), which require Defendants to make services available in the community rather than in institutions.

76.     Defendants' actions will cause Landon irreparable injury for which there is no adequate remedy at law.

### Violations of the PMRA

77.     Plaintiff hereby incorporates by reference paragraphs 1 through 76 of this Complaint.

78.     The purpose of the Persons with Mental Retardation Act ("PMRA"), TEX. HEALTH & SAFETY CODE §§ 591.001–597.054, is to promote the rights of individuals diagnosed with mental retardation to live at home.  *Id.* §§ 591.002(d), 592.013(3), 592.032.  The PMRA expressly contemplates an individual's right to receive services in an environment that is "the least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."  *Id.* §§ 591.005(1)–(2), 592.032.

79.     Landon is a person as defined within the PMRA.

80.     Landon is entitled to receive services in his home as opposed to a nursing facility or state facility for persons with mental retardation because there is available state funding to provide Landon with services in his home, which is both his least restrictive alternative and his least

restrictive living environment, as contemplated by TEX. HEALTH & SAFETY CODE §§ 591.005, 592.013, 592.032.

81.    Defendants' actions with respect to Landon as described herein violate his right as a person diagnosed with mental retardation to receive services in his own home, his least restrictive environment, and will cause Landon irreparable injury for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court assume jurisdiction of this cause;

B.    That this Court appoint John Chauvet Parker and Cristin Parker as Landon Parker's next friends to represent his interests in this lawsuit;

C.    That this Court enter a declaratory judgment that Defendants' failure to offer Plaintiff a fair hearing to appeal the decision to deny him state general revenue funding, which led to the decision to deny him SPW services, violated his due process rights, as well as federal Medicaid law and the Texas Administrative Code;

D.    That this Court enter a declaratory judgment that Defendants' denial of funding for nursing services for Landon Parker in his home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and their implementing regulations, 28 C.F.R. §§ 35.130(d), 41.51(d), as well as TEX. HEALTH & SAFETY CODE §§ 591.001–597.054;

E.    That this Court enter a preliminary and permanent injunction requiring Defendants to provide Landon with an administrative fair hearing on the denial of Rider 36 funding and enjoining Defendants from denying funding for current levels of nursing services for Landon Parker in his home pending the outcome of that hearing, or in the alternative, a preliminary and permanent injunction enjoining Defendants from

discontinuing the level of home-based private-duty nursing Defendants have been providing to Landon at his home pending the outcome of *Traylor v. Knowles*, No. 10-10246 (5th Cir. filed Aug. 2, 2010);

F.     That this Court issue a temporary restraining order, directed to Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, restraining them from terminating Landon Parker's life-sustaining nursing services, such temporary restraining order to remain in effect until a hearing may be held on his application for preliminary injunction;

G.     That this Court award Plaintiff his costs and fees; and

H.     That this Court grant such additional relief as it deems equitable and just.

Respectfully submitted,

_____/s/_____

MATT BACHOP
State Bar. No. 24055127
STEVEN P. ELLIOT
State Bar No. 24042619

ADVOCACY, INCORPORATED
7800 Shoal Creek Boulevard, Suite 142-S
Austin, Texas 78757
(512) 454-4816 (Phone)
(512) 302-4936 (Fax)

E-mail: mbachop@advocacyinc.org

ATTORNEYS FOR PLAINTIFF

## VERIFICATION

THE STATE OF TEXAS     §
            §
COUNTY OF WILLIAMSON   §

   BEFORE ME, the undersigned Notary Public, on this day personally appeared John Chauvet Parker and Cristin Parker, parents and legal guardians of Landon David Parker, who, in their capacity as guardians, after being by me duly sworn, upon their oath stated that they have personal knowledge of the facts concerning Landon David Parker stated in the foregoing Plaintiff's Original Complaint for Declaratory and Injunctive Relief and that each and every statement of fact concerning Landon David Parker contained therein is true and correct.


_____      _____
John Chauvet Parker            Cristin Parker


   SUBSCRIBED AND SWORN TO BEFORE ME on the __4ᵗʰ__ day of January, 2011, to certify which witness my hand and official seal.



JESSE BROCK TREADAWAY
MY COMMISSION EXPIRES
September 21, 2011

_____
Notary Public in and for the State of Texas